## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARK E. FIX,

      Plaintiff,

    v.

UNITED STATES OF AMERICA,

      Defendant.

ELECTRONICALLY FILED

CIVIL DIVISION

No. 094-97E

***Plaintiff's Pretrial Statement Pursuant to LR 16.1.4***

Filed on Behalf of Plaintiff

Counsel of Record for this Party:

Lawrence D. Kerr, Esquire
PA I.D. #58635

BERK, WHITEHEAD, KERR & TURIN, P.C.
115 North Main Street
Greensburg, PA   15601

(724) 838-1400

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARK E. FIX,                                    ELECTRONICALLY FILED

      Plaintiff,                               CIVIL DIVISION

    v.                                          No. 04-97E

UNITED STATES OF AMERICA,

      Defendant.

## PLAINTIFF'S PRETRIAL STATEMENT PURSUANT TO LR 16.1.4

AND NOW, comes the Plaintiff, Mark E. Fix, by and through his attorneys, Messrs. Berk, Whitehead, Kerr & Turin, P.C., and Lawrence D. Kerr, Esquire, and files the within PLAINTIFF'S PRETRIAL STATEMENT PURSUANT TO LR 16.1.4, wherein the following are statements:

**1.    Narrative statement**

On April 1, 2004, the plaintiff filed a FTCA claim against the defendant for damages from a misdiagnosis of Lyme disease. In brief, the plaintiff was erroneously diagnosed with "spider bites" by a prison mid-level provider (physician's assistant) when the plaintiff exhibited what should have been recognized as obvious signs of Lyme disease, specifically two erythematous lesions surrounded by red areas on his lower right leg while present in a high Lyme disease area (McKean County). The plaintiff's administrative claim was denied and this suit followed.

The timeline of this case starts on Friday, May 12, 2000, when the plaintiff was incarcerated at FCI-McKean. He noticed two pimple-like lesions on his inner right knee and ankle surrounded by red circular rashes. He decided to wait to see if the lesions and rashes resolved on their own.

By Monday, May 15, 2000, the lesions and rashes had not subsided, so the plaintiff went to

sick call where he was examined by MLP Hamandi.  When questioned by MLP Hamandi concerning the cause of the bites, the plaintiff stated that he did not actually see what had bitten him, but since there were spiders in and about the prison, possibly the lesions were caused by spider bites.  MLP Hamandi wrote in his chart: "The area is red itchy....there are two small erythematous lesions on the [right] lower leg.  No swelling, no discharge.  Spider bite?"  He prescribed topical ointment.  MLP Hamandi did not palpate the lesions but rather only looked at them from afar as he sat at his desk.  The entire examination took only a few minutes.

The plaintiff's experts will testify that MLP Hamandi should have made a clinical diagnosis of Lyme disease based on the symptoms presented by the plaintiff and then immediately prescribed a course of antibiotics.  At his deposition, MLP Hamandi stated that his understanding was that Lyme disease could *never* be diagnosed without first obtaining positive confirmatory blood tests; the plaintiff's experts will testify that this is simply wrong.  The plaintiff's experts will also testify that, had antibiotics been timely administered, the plaintiff would have made a complete recovery from Lyme disease.  They will state that the window of opportunity to diagnose and treat Lyme disease is very narrow, and that all doubts should be resolved in favor of early treatment lest this same unfortunately sequela result.

On May 28, 2000, the plaintiff started to experience blurry vision in one eye and was unable to distinguish shapes.  On May 29, 2000 he was sent to Bradford Regional Medical Center with an assessment of probable optic neuritis.  On June 12, 2000, blood tests, including a Lyme test, were ordered.  On June 21, 2000, the plaintiff's blood was drawn.  On July 7, 2000, the lab report was completed.

Dr. Olson read the results on July 10, 2000.  The tests indicated that the screening (ELISA) test was positive (1.56, with > 1.19 being considered positive), but the confirmation Western Blot test

indicated negative. The plaintiff's experts will testify that the negative Western Blot should not have been relied upon to confirm the absence of Lyme disease.

From June to December 2000, the plaintiff's condition gradually worsened, especially his loss of vision. He was seen by several medical doctors and an eye doctor, but his early clinical Lyme disease symptoms and positive ELISA screening test were not followed up for a possible missed diagnosis of Lyme disease. The plaintiff's experts will say that this is when he suffered irreversible optic neuritis which could have and should have been caught early on.

In December 2000 and January 2001, the plaintiff was seen by various medical doctors and given a diagnosis of possible MS. However, on January 25, 2001, the prison Clinical Director finally decided to rule out Lyme disease. On February 1, 2001, he consulted with an infectious disease doctor. The plaintiff was retested for Lyme disease and, again, his screening test was positive but his confirmatory Western Blot was negative. This time the prison medical staff acted correctly by administering a course of antibiotics for Lyme disease even though the Western Blot was negative. This shows that a negative Western Blot test does not preclude antibiotic therapy for Lyme diseases.

The plaintiff's experts will testify that, so to speak, the horse was already out of the barn with regard to the plaintiff's permanent eye damage from the missed diagnosis of Lyme disease. The defense's experts will proffer a myriad of liability defenses, starting with the initial insect bites not being deer tick bites, the plaintiff not presenting with classic clinical symptoms of Lyme disease, and the negative Western Blots being confirmatory of no Lyme disease. The defense's experts will also state that the plaintiff's chief complaint—blindness from optic neuritis—is a very rare manifestation of Lyme disease but is more commonly caused by MS. They will also argue that the plaintiff's optic neuritis onsetted too quickly to be caused by Lyme instead of MS.

From February 2001 until he was released from prison on September 21, 2001, the plaintiff

saw a host of medical doctors. During that time the plaintiff was assured by the medical staff that, if he ever did have Lyme disease, it would have been most certainly been cured by his antibiotics, so his increasing vision problems could not possibly have been resultant from Lyme. This is significant because the government will reassert its legal defense of the statute of limitations. However, according to case law, the plaintiff was misled as to his poor early treatment and thus the statute was tolled until such time that he made a timely FTCA claim.

By the time the plaintiff was released from prison, he was very ill and could barely walk. At that time he reluctantly accepted his diagnosis of MS, which he had denied during his confinement because he did not want to accept that he had a lifelong debilitating disease.

In November 2001, the plaintiff's brother convinced him to see Dr. Joseph Joseph, an internist from Hermitage, PA, who for many years has specialized in the treatment of Western Pennsylvania Lyme disease victims. After reviewing the plaintiff's clinical symptoms and history and physical, Dr. Joseph made an immediate diagnosis of Lyme disease and began treating the plaintiff with additional antibiotics. This is the first time any doctor told the plaintiff that, in fact, he had Lyme disease which should have been treated in May 2000. Since November 2001, Dr. Joseph has continued to examine and treat the plaintiff for Lyme disease. Except for his optic neuritis, which both sides agree is permanent, the plaintiff's symptoms have resolved. Except for his loss of vision, the plaintiff's other symptoms from Lyme disease resolved as a result of Dr. Joseph's treatment. The plaintiff has had no relapses since leaving prison which tends to dispute the defendant's contention that he has MS instead of Lyme disease.

The defense's experts will argue that the plaintiff never had Lyme disease but instead has MS. To this extent this case will be a typical battle of medical experts. However, the testimony of the experts will quickly show that the question of Lyme Disease vs. MS is a very well documented and

somewhat political debate. Conventional doctors such as the defense's doctors are reluctant to admit a missed diagnosis of Lyme disease and thus Lyme disease specialists like Dr. Joseph often make the medical establishment look bad.

The conflicting medical testimony will also reveal a somewhat unusual predicament for modern medicine, viz., that this particular disease—Lyme—must not be diagnosed and treated based solely or even primarily on the results of scientific laboratory testing. Rather the clinical symptoms of Lyme disease are the gold standard for making and treating the disease. To this extent this case will be unlike most medical cases involving questions such as DNA testing, drug urinalysis, etc. Simply put, modern medical testing has not yet developed a foolproof laboratory test for Lyme disease, so the early clinical presentation and diagnosis is the touchstone for what is normally left to the laboratory.

The plaintiff is now legally blind and survives on Social Security Disability. He can see shapes and shadows, but he has very little depth perception and no color vision. He cannot drive a car and had to turn his driver's license in. The issue of the plaintiff's significant damages has not been contested by the defense.

**2.    Damages claimed**

    a.    Lost earnings capacity $897, 896.00 (combined past and future earning) as stated in the expert report of Donal F. Kirwan, SPHR, dated April 6, 2006, which report is incorporated by reference and has been provided to defense counsel

    b.    Physical and mental pain and suffering

    c.    Loss of life's pleasures

    d.    Loss of eyesight

    e.    Other damages as stated in the complaint

3.    **Witnesses**

    A.    **Liability Witnesses**

        1.    Plaintiff

        2.    Plaintiff's brother Martin Fix

        2.    MLP Hamandi

        2.    Dr. DiMarco

        3.    Dr. Joseph

        4.    Dr. Felder

        5.    Plaintiff reserves the right to call all witnesses designated as liability witnesses by the defendant.

    B.    **Damage Witnesses**

        1.    Donal F. Kirwan, SPHR, Forensic Human Resources

        2.    Plaintiff

        3.    Mrs. Sherry Fix (wife)

        4.    Martin Fix (brother)

        5.    Mrs. Fix (mother)

        6.    Dr. Joseph, treating physician

        7.    Plaintiff reserves the right to call all witnesses listed by the defendant as damage witnesses

4.    **Depositions**

    A.    Mr. Hamandi (his deposition is very brief)

    B.    Deposition of plaintiff if needed for prior consistent statements

    C.    Plaintiff reserves the right to use all deposition excerpts designated by the

defendant

5. **Documents**

A.      Plaintiff reserves the right to introduce all documents identified by the defendant.

6. **Legal Issues**

The central question is whether there was medical negligence.  To that extent the legal issues are rather straightforward.  The defense will argue that, even if the standard of care was breached, there was no proximate cause since the plaintiff has MS, not Lyme disease.  The only other legal issue is the statute of limitations which has been extensively briefed and argued during pretrial motions.

7. **Expert Reports**

A.      Dr. DiMarco Report, July 29, 2006, attached

B.      Dr. Joseph Reports, November 8, 2002, March 25, 2004, and SFebruary 24, 2006, attached

C.      Dr. Felder Reports, April 7, 2006 and May 30, 2006, attached

D.      Donald F. Kirwan, economist, April 6, 2006, attached

8. **Medical Records**

A.      Medical records from the plaintiff's treatment while incarcerated at FCI McKean.  The parties have identical copies and have stipulated to the authenticity of these records.

B.      Dr. Joseph's record's and test results relied upon

C.      Dr. Felder's record's and test results relied upon

D.      Though counsel have agreed they have the same medical records, the plaintiff reserves the right to use any and all medical records in possession of the defense.

Respectfully submitted,
BERK, WHITEHEAD, KERR & TURIN, P.C.

Lawrence D. Kerr, Esquire
Attorney for Plaintiff

115 North Main Street
Greensburg, PA   15601

(724) 838-1400



# ANTHONY E. DiMARCO, D.O. FACOFP
## FAMILY MEDICINE

CROZER MEDICAL PLAZA AT BRINTON LAKE
300 EVERGREEN DRIVE · SUITE 330
GLEN MILLS, PA 19342

TEL: (610) 579-3444
FAX:(610) 579-3449

Lawrence D. Kerr

Berk Whitehead Kerr & Turin,P.C.

115 North Main Street

Greensburg, Pa. 15601


Re. Mark Fix

File #: 25319

7/29/06


Dear Mr. Kerr;

I have reviewed all of the medical record that you have sent me in order to give my opinion in this case.

To review, Mark Fix was incarcerated at FCI-McKean when on May 12, 2000 he noticed two pimple like skin lesions which were surrounded by circular rashes on his right inner knee and ankle. When the skin lesions did not improve by May 15, 2006 Mr. Fix went to sick call where he was seen by a physician assistant who diagnosed the condition as either a spider bite or allergic dermatitis and prescribed hydrocortisone cream. Thirteen days later on May 28, 2000 Mr. Fix complained of blurry vision in one eye, he was able to see shapes but could not read an eye chart and had difficulty distinguishing colors. He was seen in the prison medical clinic the next day on May 29, 2000 and was then sent to the Bradford Regional Medical Center the same day and diagnosed with a probable optic neuritis and given eye drops and pills. There was no improvement and on May 30,2000 his left eye did not respond to light or pinpoint. Mr. Fix was then sent to an outside eye doctor on June 2, 2000 who again diagnosed optic neuritis. On June 8, 2000 Mr. Fix was sent out to an ophthalmologist who diagnosed optic neuritis, continue the prednisone medication and ordered tests and bloodwork which included a Lyme titre, which was actually ordered on June 12, 2000 and drawn on June 21, 2000.

1

From September 2000 to November 2000 Mr. Fix continued to have similar symptoms. By this time he was transferred to another correctional facility, FCI-Loretto. On November 29,2000 he complained of starting to have difficulty seeing out of his right eye. This continued to worsen until on December 20, 2000 Mr. Fix complained of only being able to see shadows out of his right eye. On January 3, 2001 the prison clinical director diagnosed optic neuritis. On January 22, 2001 the prison medical staff contacted the contracted prison neurologist who advised to srat the patient on Avonex for MS and to get an infectious disease consult due to the Positive Lyme titre from June 12, 2000. This is the first time that the Positive Lyme titre appears in any of the medical records that I reviewed. This means that Mr. Fix went at least six months with Lyme Disease which was not treated. On February 1, 2001 the clinical director spoke with the infectious disease doctor who recommended either ceftriaxone IV for four to six weeks or oral doxycycline. The clinical director chose the oral doxycycline.

On February 12, 2001 Mr. Fix stated that the vision in his right eye had improved but the the vision in his left eye had not improved. He also indicated that he developed equilibrium problems, staggering and his head felt funny, but by the end of February 2001 Mr. Fix 's vision showed some improvement.

On April 9, 2001 Mr. Fix complained of increased dizziness, numbness throughout his body and unsteadiness. The neurologist was called and MS was suspected along with Lyme Disease. He was medically transferred to the Federal Medical Center at Rochester, Minnesota with the diagnosis of 1) optic neuritis, 2) possible MS and 3) elevated Lyme Antibodies and possible Lyme Disease. It should be remembered at this point that Lyme Disease was diagnosed a full ten months earlier and treated only four months earlier.

On May 16, 2001 Mr. Fix was informed that he had MS and not Lyme Disease. Upon release from incarceration on September 21, 2001 he sought medical attention and on December 17,2001 was diagnosed with Lyme Disease.

Lyme Disease is a potentially multisystem disease that can be easily treated in its early stages but is quite difficult to treat if left to progress to the later stages. It is caused by a tick-borne spirochete borellia burgdorferi. The clinical features can be divided into three phases;

2

- early localized
- early disseminated
- neurologic and cardiac disease and late disease or rheumatologic disease.

The difficulty of treatment is directly related to which stage the patient is in. I t is imperative for the physician to clinically recognize this disease process in its early localized or early disseminated stage so that the Lyme Disease can be more easily treated. If the physician or physician extender does not clinically recognize the Lyme Disease until it is in the neurologic and cardiac and late disease stageor rheumatologic disease, or relies solely on a lab test and not his or her clinical decision then there can often be symptoms and consequences that are not reversible even with extended antibiotic use. The key to the treatment of Lyme Disease is early clinical detection and early treatment. A simple course of antibiotics which can cure Lyme Disease in the early localized and early disseminated phases may due little in the treatment of neurologic and cardiac and late disease or rheumatologic disease.

Pennsylvania is a very endemic area for Lyme Disease. Erythema Migrans or the classic Bull's eye rash occurs in approximately 75-80% of all diagnosed cases of Lyme Disease. It does not occur in the absence of Lyme Disease. Therefore if it is seen on or described by the patient then that patient has Lyme Disease and should immediately be treated with antibiotics. Since a positive lab test does not occur for four to six weeks after infection it should only be done at this early stage for comfirmatory reasons and to possibly establish a timeline in order to choose the correct treatment and not for diagnostic reasons. If a Lyme titre is negative but the patient has Erythema Migrans then that patient has Lyme Disease. You cannot ignore the rash because of a negative initial blood test and state that the patient does not have Lyme Disease. This would be injurious to the patient and not be the standard of care.

When Lyme Disease is left to progress to the neurologic late phase a wide variety of neurological manifestations can occur which include meningitis, encephalitis, cranial neuritis (most commonly facial palsy) radiculoneuritis, mononeuritis multiplex, cerebellar ataxia, and myelitis. The eyes can also be affected in Lyme Disease because of direct infection which can result in conjunctivitis, choroiditis, iritis, keratitis, neuroretinitis, and endophthalmitis. Although it is rare, vision can be affected in Lyme

3

Disease because of the involvement of the optic nerve either because of inflammation or increased intracranial pressure.

Mark Fix noticed two large skin lesions which were surrounded by circular rashes on his right knee and right ankle on May 12, 2000. He was seen at sick call on May 15, 2000 and was prescribed cortisone cream for a spider bite. The lesions describe by Mr. Fix is the classic description of Erythema Migrans or Bull's eye rash which is diagnostic for Lyme Disease. Mr. Fix had Lyme Disease at this point. If he had been treated at this point with a few weeks of antibiotics then the Lyme Disease would not now be an issue. Because of this misdiagnosis he went six months without being treated as per the beginning of this report. The loss of vision (optic neuritis) and  difficulty walking (cerebellar ataxia) are manifestations of the neurologic late phase of Lyme Disease. At this point it is much more difficult to treat Lyme Disease and there is no guarantee that all of the neurological symptoms will go away.

It is understandable that Mr. Fix's optic neuritis is being attributed to multiple sclerosis because the physicans seeing him at the time appear to have been unaware of his Lyme Disease as stated above. Early detection of Lyme Disease can prevent a considerable amount of morbidity and suffering for a patient.

In conclusion, it is my medical opinion and to a reasonable degree of certainty that Mark Fix had Lyme Disease as of May 12, 2000 and that it should have been treated because of the two rashes, Erythema Migrans, which are diagnostic for Lyme Disease. The failure to diagnose and delay in treatment of Mr. Fix's Lyme Disease ultimately led to the morbidity and neurological manifestations the he experienced. He could have been treated quite simply with a few weeks of antibiotics early on if he had been properly diagnosed. Because he was not treated he progressed to the neurologic late phase which can manifest itself in all of the symptoms that Mr. Fix was experiencing. I am not debating that optic neuritis is a common manifestation of MS but in this particular set of circumstances where an individual was clearly not diagnosed and left to progress to the neurologic late phase of Lyme Disease I believe that Mr. Fix's optic neuritis is a manifestation of Lyme Disease.

The above opinions are expressed to a reasonable degree of medical certainty.

4

Sincerely;

Anthony E. Di Marco,D.O., FACOFP

*Joseph T. Joseph, M.D.*
INTERNAL MEDICINE

November 8, 2002

Mr. Mark Fix
1140 Brinton Avenue
Pitcairn, PA 15140

Dear Mark,

    This is the update you requested.  As you know you had a tick bite on May 15, 2000.
You also had two bullseye rashes – one being very large by the knee and the other on the
right ankle.  You developed blindness in the same year.  When you came here, I was quite
suspicious for Lyme as you had two bites and were in a location that is endemic for Lyme.
My clinical diagnosis when you came here was that you did have Lyme.

    On today's visit, November 8, 2002, we reviewed your MRI's and you definitely have
lesions in your brain.  They are not in the same position every time with the three MRI's
that you have had.

    You do have a positive Western Blot IGM for Lyme from October 15, 2002.  This would
most certainly indicate that you do have Lyme Disease and it is still an active disease
because it is IGM positive.

    If you have any questions, please do not hesitate to call me.  Thank you.

                                            Sincerely,

                                            Joseph T. Joseph, M.D.

JTJ:p

1466 NORTH HERMITAGE ROAD   •   HERMITAGE, PA 16148   •   (724) 962-3633

*Joseph T. Joseph, M.D.*

*Internal Medicine*

### 1466 North Hermitage Road
### Hermitage, PA  16148
### Phone (724) 962-3633   Fax (724) 962-1503

March 25, 2004

Lawrence D. Kerr, Esquire
115 North Main Street
Greensburg, PA  15601

RE: Fix, Mark

Dear Mr. Kerr:

.This is in response to a request to update you.  The above captioned individual has been under our care and he wanted me to give an opinion apparently on the care that he was given while he was incarcerated. Apparently he had been bitten by something while he was incarcerated.  In May 2000 he was bitten by a tick historically.  He was prescribed topical treatment.  The rash, as what he described at that time, sounds like it was an erythema migrans rash, which would be a typical rash that you would see with Lyme disease.  However, we do not have a picture of that rash at this juncture in time, and are going purely on historical information from him.  He was prescribed the topical treatment, which was some kind of a cream.  Of course, with the EM rash, if one suspected it was an erythema migrans rash, the diagnosis of Lyme should have been made and he should have been treated with some kind of an antibiotic.  However, again, I am not sure what the rash looked like so I cannot make a judgment call on that.  The thinking, of course, is that if it was Lyme it should have been treated.

. He was again diagnosed with Lyme disease in December 2001 after the presumptive diagnosis of Lyme disease in January 2001 that was made by a prison doctor and was treated with six weeks of antibiotic.  At that time, I am not sure exactly what testing was done and how the doctor came to that conclusion. However, he had six weeks of antibiotics at that time.  He came to us in December 2001 and was diagnosed with the Lyme disease and was treated by us.  He had some visual disturbances and had some blindness in both eyes and was worked up for that, and no one could give him an answer as to why he went blind in both eyes.  He is now regaining some vision in his eyes but continues to have significant loss of vision however.  At this juncture in time, he is currently not on any treatment for the Lyme disease but continues to have the visual disturbance problem and has done very well with his treatment otherwise. At this juncture in time, he has had the presumptive diagnosis of Lyme disease back in 2001 and then diagnosed as Lyme in December 2001 by myself and had treatment of the Lyme disease with adequate resolution of the symptoms except for his eye problems.

If you have any questions, please do not hesitate to call me.

Sincerely,

Joseph T. Joseph, M.D.

JTJ/klm

*Joseph T. Joseph, M.D.*
INTERNAL MEDICINE

February 24, 2006

Attorney Lawrence Kerr
115 North Main Street
Greensburg, PA 15601

RE:  Mark Fix

Dear Attorney Kerr:

This is a very interesting letter that we got from Dr. Wormsler with his opinion. However, he does state that there was one case out of 440 subjects and who is to say that Mr. Fix wasn't one of those 440 people who would develop bilateral optic neuritis from Lyme Disease.  I have seen people get diseases with much greater odds than that.

At this juncture in time, I am still going to stick by my diagnosis of Lyme Disease with this gentleman.  He was in an endemic area – much like the endemic area where Stoneybrook did their study.  The study that was done at Stoneybrook relied on Western Blot testing for Lyme and for confirming that the patient had Lyme Disease.  On the CDC website, the criteria for diagnosing Lyme Disease shows none as Lyme is a clinical diagnosis made by talking to the patient, their history of tick bites and rashes and the clinical symptoms.  The surveilance criteria that the CDC uses in reporting Lyme Disease cases is frequently misinterpreted as a diagnostic criteria for diagnosing Lyme. The study that was done at Stoneybrook NY used surveilance criteria as a diagnostic criteria.  In my opinion, the study if null and void and anyone who looks at medical studies would have to agree with that.

As I stated, I still believe that Mr. Fix has Lyme Disease.  If you have any questions, please do not hesitate to call me.  Thank you.

Sincerely,

Joseph T. Joseph, M.D.

JTJ:p



**MITCHELL S. FELDER, M.D.**

BOARD CERTIFIED IN NEUROLOGY

DIPLOMATE OF THE AMERICAN BOARD
OF PSYCHIATRY AND NEUROLOGY

SUITE 2
87 STAMBAUGH AVENUE
SHARON, PENNSYLVANIA 16146

TELEPHONE (724) 346-0858
FAX (724) 346-9596

April 7, 2006

BERK WHITEHEAD KERR & TURIN, P.C.
ATTN: Attorney Lawrence D. Kerr
115 North Main St.
Greensburg, PA 15601

RE: Mark Fix

Dear Attorney Kerr:

In response to your letter of 3/14/06 I am enclosing the following narrative medical report regarding Mr. Mark Fix.

Mark Fix is a 49 year old male, DOB 9/28/56 who was seen in my office on 3/9/06. At my office the patient stated "I do not see any colors". The patients vision has deteriorated to 20/400 and he is only able to see hand signs for the past approximately 6 years. The patient has had a bilateral loss of his vision and has had erythematic lesions in 5/15/2000. He stated the lesions were elevated "like a mini volcano" and were bullseye shaped. The patient subsequently had headaches, stiff neck and flu-like syndrome. His left eye went blind in May 27 of 2000 and he stated he had no pain at that time, but states "it was like looking through a heavy lace curtain." He then had a very slight improvement. The patient on June 11, 2000 had a Lyme Disease Titer that was 1.56 with a top range of 1.00. Novemver 29, 2000 the patient had the same symptomatology in his right eye losing vision with a decreased ability to see colors. Occasionally, he would see "a spark of color". Patient was released from prison on 9/21/01 and then received antibiotic treatment in February 1, 2001, 81/2 months after his two tic bites. At this point in time the patient states the headaches with occasional jabbing pains that are bifrontal, status-post severe headaches, difficulty with gait since February 2001, which improved tremendously after antibiotic treatment as per the patient.

At my office the patients vital signs were 140/87, 70, 22, afebrile; HEENT atraumatic normocephalic, no neck rigidity, no carotid bruit; heart S1 S2 no S3 no S4 no rub no murmur, regular rate & rhythm; lungs were clear; cranial nerves showed pupils 3 millimeters minimally reactive; no facial asymmetry; hearing was intact bilaterally; vision the patient was able to see fingers only; patient had no nystagmus; mental status was alert and oriented X3; he could follow 3 of 3-step commands; deep tendon reflexes were 2/4 bilaterally symmetrical with plantar response flexor bilaterally. Sensory was intact to light touch, pin prick, vibration sense bilateral upper and bilateral lower

extremities; cerebellar function was within normal limits; gait was within normal limits; tandem gait was done moderately poorly.

This patient has a diagnosis of Lyme Disease which is most likely. There is also the rule out of Multiple Sclerosis, however, this would be very much less likely by history. The patient will be obtaining a chest x-ray, blood work, and EKG and MRI of brain. Also, a VER (visual evoked response) will be done. I discussed the possibility of an LP, however the patient does not want this performed.

It is my medical and neurological opinion that Mr. Fix's standard of care fell below acceptable standards for the treatment of Lyme Disease. The patient was bitten by deer tics and contracted Lyme Disease in my medical and neurological opinion resulting in his symptomatology.

Please feel free to call should you have any further queries concerning this patient at any time.

Yours truly,

Mitchell S. Felder, M.D.

MSF:dz



**MITCHELL S. FELDER, M.D.**

BOARD CERTIFIED IN NEUROLOGY
DIPLOMATE OF THE AMERICAN BOARD
OF PSYCHIATRY AND NEUROLOGY

SUITE 2
87 STAMBAUGH AVENUE
SHARON, PENNSYLVANIA 16146

TELEPHONE (724) 346-0858
FAX (724) 346-9596

May 30, 2006

BERK, WHITEHEAD KERR 7 TURIN, P.C.
Attn: Attorney Lawrence D. Kerr
115 North Main St.
Greensburg, PA 15601

RE: MARK FIX

Dear Attorney Kerr:

In response to your letter of 5/24/06 Mr. Fix has a CSF protein of 51 which could be supportive of a possible diagnosis of Lyme Disease. It should be noted that the patient does have an increase in oligoclonal bands and CSF IGG index which may also be interpreted as supportive as a Demyelinating Disease such as Multiple Sclerosis.

I hope that this letter is of benefit to you in your continuing evaluation of Mr. Mark Fix. Please feel free to call me should you have any further queries concerning this patient.

Yours truly,

*Mitchell S. Felder, MD*

Mitchell S. Felder, M.D.

MSF:dz

# FORENSIC HUMAN RESOURCES
413 Sylvania Drive
Pittsburgh, PA  15229

Phone: (412) 260-8000

Fax: (412) 364-7221

April 6, 2006

Mr. Larry Kerr, Esq.
Berk, Whitehead, Kerr & Turin, PC
115 North Main Street
Greensburg, PA 15601

Dear Mr. Kerr:

This report has been prepared and is submitted in response to your request for an economic loss evaluation in the case of your client, Mark E. Fix.

You asked that we become familiar with your client's background and current circumstances in order to provide an opinion as to the labor economic effects of the injuries sustained as a result of the effects of Lyme disease. We interviewed Mr. Fix and reviewed his educational background and work history. We also reviewed a medical narrative written by Joseph T. Joseph, MD, dated December 9, 2003.

Mark Fix was born September 28, 1956 and is currently 49.5 years old. He graduated from Gateway High School in 1974. He also attended Forbes Trail Vo-Tech to study carpentry and auto body classes. Mr. Fix later attended Community College of Allegheny County to study accounting. He indicated that he took two years of classes at that institution. After high school, Mr. Fix stated that he worked for Giant Eagle's warehouse from 1974 to 1985, at which time, in an effort to better his economic position, he began a trucking escort service. That business developed into a truck leasing business. He indicated that he purchased a flat bed truck and leased it to haul steel. In 1993, he started a lawn and garden equipment rental business. That business also did landscaping projects as well. From 1994 to 1998, he stated that he was involved in real estate investing and maintaining that property. Mr. Fix was incarcerated in a minimum security facility from 1998 to September 21, 2001. It is my understanding that during this time, he was infected by Lyme disease and subsequently lost his vision.

Dr. Joseph states:

> He is apparently blind and his vision is very limited. He has the Lyme disease and his prognosis at this point is good with the Lyme disease; however, he has a significant limitation having blindness in his eyes as far as his mobility and I believe that definitely this is an issue with him.

Mr. Fix is concerned about the effects his vision restrictions will have upon his ability to earn a living. Mr. Fix is no longer able to participate in his past occupations due to his injury. His

*Expert Witness in Matters of Employability, Lost Earnings
and Diminished Earning Capacity*

Mark E. Fix

Page 2

earning capacity is impacted – he had demonstrated a record of successful self-employment in the past. For the purposes of this report, I will assume that Mr. Fix would have had some earning capacity after his release from prison. Taking into consideration his past work experience, I will assume that he would have returned to the landscaping business but for his blindness and have assigned to him the wages associated with a Supervisor, Landscaping and Groundskeeping Workers (US Department of Labor, O*Net SOC 37-1012). The Pennsylvania Department of Labor and Industry, Center for Workforce Information and Analysis data show that the median wage of an individual in that capacity was $45,898 as of May 2003. That median wage increased to $48,750 as of November 2004. (http://www.paworkstats.state.pa.us/, accessed March 31, 2006).

*The New Worklife Expectancy Tables, Revised 2002*, (Vocational Econometrics, Inc., Louisville, KY, 2002) cite the future worklife expectancy of a male who graduated high school with some college, age 44.98 at the time of his release, who is unimpaired, that is with no work disability, as 18.6 years.

To determine his future lost earnings capacity from September 21, 2001 to his tabular worklife expectancy, I calculated the 2001 wages to be $42,917 based upon US Department of Labor Employment Cost Index statistics and then increased those wages for 2002, 2003 and 2004. The wages for 2003 and 2004 are from the Pennsylvania Center for Workforce Information and Analysis. I did not increase the wages from that point. Since in my model, I assumed that he would be again self-employed, I did not include that value of employee benefits.

Mr. Fix's lost earnings capacity from September 21, 2001 to the date of this report is $210,521. Over the course of his remaining future worklife expectancy, 14.1 years, his future lost earnings capacity is projected to be $687,375. His total lost earnings capacity is $897,896, to a reasonable degree of professional certainty.

Very truly yours,

Donal F. Kirwan, SPHR

| Date | | Annual Wage | Time Frame | Lost Wages |
|---|---|---|---|---|
| 9/21/2001 | 4/30/2002 | $42,917 | 0.61 | $26,108 |
| 5/1/2002 | 4/30/2003 | $44,659 | 1 | $44,659 |
| 5/1/2003 | 10/30/2003 | $45,898 | 0.5 | $22,949 |
| 11/1/2003 | 4/30/2004 | $46,558 | 0.5 | $23,279 |
| 5/1/2004 | 10/30/2004 | $48,928 | 0.5 | $24,464 |
| 11/1/2004 | 3/31/2006 | $48,750 | 1.42 | $69,063 |

**Past Lost Earnings Capacity:** $210,521

**Future Lost Earnings Capacity**

| | | | | |
|---|---|---|---|---|
| 4/1/2006 | 5/8/2020 | $48,750 | 14.1 | $687,375 |

**Total Lost Earnings Capacity:** $897,896

*Expert Witness in Matters of Employability, Lost Earnings*
*and Diminished Earning Capacity*